# IN THE SUPREME COURT OF CALIFORNIA

KURT STOETZL et al.,
Plaintiffs and Appellants,

v.

DEPARTMENT OF HUMAN RESOURCES et al.,
Defendants and Respondents.

S244751

First Appellate District, Division Four
A142832

San Francisco City and County Superior Court
CJC11004661

July 1, 2019

Justice Chin authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Kruger, and Groban concurred.

Justice Liu filed a concurring and dissenting opinion in which Justice Cuéllar concurred.

# STOETZL v. DEPARTMENT OF HUMAN RESOURCES

## S244751

Opinion of the Court by Chin, J.

In this case, we decide whether a certified class of state correctional employees is entitled to additional compensation for time spent on pre- and postwork activities, including traveling from the outermost gate of the prison facility to their work posts within the facility, traveling back from their work posts to the outermost gate, being briefed before the start of a shift, briefing relief staff at the end of a shift, checking out and checking back in mandated safety equipment, putting on and removing such equipment, and submitting to searches at various security checkpoints within the facility.  For convenience, we will refer to the time spent doing these pre- and postwork activities as "walk time" although we recognize that walk time includes many activities besides merely walking to and from a work post. There are two types of walk time that are relevant here.  The first is the time a correctional employee spends after arriving at a prison's outermost gate but before beginning the first activity the employee is employed to perform (plus analogous time at the end of the employee's work shift).  We will call this type of walk time "entry-exit walk time."  The second is the time a correctional employee spends after beginning the first activity the employee is employed to perform but before the employee arrives at his or her assigned work post (plus analogous time at

the end of the employee's work shift). We will call this type of walk time "duty-integrated walk time."[1]

The trial court divided the plaintiff class into two subclasses, one for supervisory employees who were not represented by a union during the time period set forth in the class certification and the other for represented employees. We conclude that the subclass of represented plaintiffs expressly agreed, by way of the collective bargaining process, to a specific amount of compensation for duty-integrated walk time, and there is no allegation that the state failed to pay the agreed-upon amount. Moreover, the collective bargaining agreements that memorialized this agreement all provided that they constituted the entire understanding of the parties concerning matters contained therein, and thus they precluded other forms of compensation, such as compensation for entry-exit walk time. These agreements were approved by the Legislature, and each approval was signed by the Governor and chaptered into law, thus becoming specific legislation applicable to the represented plaintiffs and superseding more general laws to the extent of any conflict. Therefore, the represented plaintiffs' claims fail insofar as they seek additional compensation for either duty-integrated walk time or entry-exit walk time.

As to the subclass of unrepresented plaintiffs, we conclude that they may be entitled to additional compensation for duty-

---

[1]     As will be seen, the relevance of these two types of walk time turns on the definition of compensable work that applies under the federal Fair Labor Standards Act of 1938 (FLSA) (29 U.S.C. § 201 et seq.) as amended by the Portal-to-Portal Act of 1947 (Portal-to-Portal Act) (29 U.S.C. § 252 et seq.). Our definitions are designed to reflect the distinction drawn by the Portal-to-Portal Act.

integrated walk time. The terms and conditions that govern the employment of the unrepresented plaintiffs are determined by the Department of Human Resources (CalHR) and set forth in a manual known as the Pay Scale Manual and also in CalHR's regulations. The Pay Scale Manual defines compensable work time for purposes of calculating an employee's right to regular and overtime compensation, and duty-integrated walk time falls squarely within that definition. If, as is alleged, the state did not take duty-integrated walk time into consideration when calculating the compensation owed to the unrepresented plaintiffs, then those plaintiffs may be entitled to additional pay.

Entry-exit walk time, by contrast, does not fall within the Pay Scale Manual's definition of compensable work time. Moreover, because the Pay Scale Manual comprehensively addresses the question of compensation for the unrepresented plaintiffs, it precludes compensation for any work time that falls outside the scope of its definition. Therefore, insofar as the unrepresented plaintiffs are seeking compensation for entry-exit walk time, their claims must be rejected.

The Court of Appeal reached somewhat different conclusions, and therefore we reverse its judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

### A. Pretrial Proceedings

This matter arises from the coordination (see Code Civ. Proc., § 404 et seq.; Cal. Rules of Court, rule 3.501 et seq.) and joint disposition of three class-action complaints. The named defendants are the State of California and various departments of the state government. In each of the operative complaints, plaintiffs allege causes of action for (1) failure to pay contractual overtime in violation of Labor Code sections 222 and 223; (2)

3

failure to pay the minimum wage in violation of Labor Code sections 1182.11, 1182.12, and 1194, and in violation of the applicable wage orders (Cal. Code Regs., tit. 8, § 11000 et seq.); (3) failure to keep accurate records of hours worked in violation of Labor Code section 1174; and (4) failure to pay contractual overtime in breach of common law contractual obligations. The gist of all these claims is that the state did not adequately compensate plaintiffs for walk time. Plaintiffs seek relief in the form of unpaid overtime compensation, unpaid California minimum-wage compensation, liquidated damages, injunctive relief, and attorneys' fees.

The trial court granted class certification in all three actions, and it certified two plaintiff subclasses, one comprising unrepresented supervisory employees and the other comprising represented employees. Defendants then moved for judgment on the pleadings, which the trial court granted as to the causes of action for failure to pay contractual overtime in violation of Labor Code sections 222 and 223, and for failure to keep accurate records of hours worked in violation of Labor Code section 1174. The trial court ruled that Labor Code sections 222, 223, and 1174 are inapplicable to the state government. As to plaintiffs' other two causes of action, the trial court denied defendants' motion.

The matter then proceeded to trial, but the parties stipulated that the trial could proceed in multiple phases. In the first phase, several threshold questions were tried to the court. A brief overview of two regulatory schemes is helpful to understand the threshold questions tried at the first phase.

### B. Regulatory Background

#### 1. *Wage Order No. 4*

The Industrial Welfare Commission (IWC) was created in 1913 with express authority to adopt regulations — called wage orders — governing wages, hours, and working conditions in the state of California. (Stats. 1913, ch. 324, § 6, pp. 634–635; see *Martinez v. Combs* (2010) 49 Cal.4th 35, 52–57 (*Martinez*) [describing the creation and role of the IWC].)[2]  These wage orders, being the product of quasi-legislative rulemaking under a broad delegation of legislative power, are entitled to great deference, and they have the dignity and force of statutory law. (*Brinker Restaurant Corp. v. Supreme Court* (2012) 53 Cal.4th 1004, 1027 (*Brinker*); see *Martinez*, at p. 61.)  Our past cases have used the term "extraordinary" to describe this deference (*Martinez*, at p. 61), noting in this context that the Legislature's authority to delegate its legislative power to the IWC is expressly recognized in the state's Constitution (*Martinez*, at pp. 60–61).  It remains true, of course, that the Legislature can enact statutes that supersede the wage orders — as occurred in the case of the Eight-Hour-Day Restoration and Workplace Flexibility Act of 1999 (Stats. 1999, ch. 134, pp. 1820–1830) — but courts must seek to harmonize IWC wage orders with statutes to the extent possible (*Brinker*, at p. 1027).

IWC wage order No. 4-2001, which is at issue here, governs wages, hours, and working conditions in professional,

---

[2]  The IWC's wage orders originally protected only women and children, but since the 1970's, they have applied to all California employees. (See Stats. 1973, ch. 1007, § 8, p. 2004; Stats. 1972, ch. 1122, § 13, p. 2156; see generally *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 700–701.)

technical, clerical, mechanical, and similar occupations. (IWC wage order No. 4-2001 (Wage Order No. 4); see Cal. Code Regs., tit. 8, § 11040.) Wage Order No. 4 includes a minimum wage section, which requires employers to pay their employees at not less than a designated hourly rate "for all hours worked" (Wage Order No. 4, § 4(A)(1)), and an overtime section, which defines regular hours and requires employers to pay their employees at an appropriate multiplier of their regular rate "for all hours worked" in excess of those regular hours (Wage Order No. 4, § 3(A)(1)).

Both the minimum wage and the overtime sections of Wage Order No. 4 refer to "all hours worked," which the wage order defines as "the time during which an employee is subject to the *control* of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." (Wage Order No. 4, § 2(K), italics added.) The parties refer to this definition of compensable work time as the "control standard." Under applicable case law, an argument can be made that *both* types of walk time at issue in this case fall within this definition. (See *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 587–588 [holding that compulsory travel time on an employer's buses, to and from agricultural fields, is compensable under the wage order "hours worked" definition, because the employees are subject to employer "control"] (*Morillion*).)

By reason of a 2001 amendment, Wage Order No. 4 applies to employees of the state government, but only in part. Before the 2001 amendment, former section 1(B) of the wage order stated: "The provisions of this Order shall not apply to employees directly employed by the State . . . ." (IWC wage order No. 4-2000, § 1(B).) As a result of the 2001 amendment,

section 1(B) now states: "*Except as provided in Sections 1, 2, 4, 10, and 20*, the provisions of this order shall not apply to any employees directly employed by the State . . . ." (Wage Order No. 4, § 1(B), italics added.) Thus, only sections 1, 2, 4, 10, and 20 of Wage Order No. 4 govern state employment.[3]  (See *Sheppard v. North Orange County Regional Occupational Program* (2010) 191 Cal.App.4th 289, 300–301 (*Sheppard*).)  The sections that are most relevant here are section 2, which is the "Definitions" section (and which includes the definition of "[h]ours worked"), and section 4, which is the "Minimum Wages" section.  Significantly, section 3 — which is the section of Wage Order No. 4 that guarantees overtime pay — is not among the excepted sections listed in the opening clause of section 1(B) of the wage order, and therefore section 3's overtime guarantee is not applicable to state government employees.

In summary, Wage Order No. 4's "Definitions" and "Minimum Wages" sections expressly apply to rank-and-file employees of the state government, and *Morillion, supra*, 22 Cal.4th 575, supports an argument that both types of walk time at issue in this case fall within Wage Order No. 4's definition of "[h]ours worked," a definition that focuses on "control."

### 2.  *The Pay Scale Manual*

"Under the California Constitution it is *the Legislature*, rather than the Governor, that generally possesses the ultimate authority to establish or revise the terms and conditions of state employment through legislative enactments, and . . . any authority that the Governor or an executive branch entity . . . is

---

[3]     Sections 4 and 10 do not apply to administrative, executive, or professional employees of the state government. (Wage Order No. 4, § 1(A).)

entitled to exercise in this area emanates from the Legislature's delegation of a portion of its *legislative authority* to such executive officials or entities through statutory enactments." (*Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989, 1015 (*Professional Engineers*), second italics added; see *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 188.) The Legislature has delegated to CalHR express authority to adopt regulations governing the terms and conditions of state employment, including setting the salaries of state workers (Gov. Code, § 19826) and defining their overtime (*id.*, §§ 19843, 19844, 19845, 19849). Under this delegated legislative authority, CalHR has adopted the Pay Scale Manual, setting forth salary ranges for thousands of job classifications and establishing "work week groups" for purposes of regulating overtime. (See CalHR, California State Civil Service Pay Scales — Online Manual (54th Edition) (2019) <http://www.calhr.ca.gov/state-hr-professionals/pages/pay-scales.aspx> [as of June 27, 2019] (the Pay Scale Manual, or the Manual).)[4]

The wages and hours of workers in California, including state government workers, are also governed by federal law,

---

[4] Section 10 of the Manual, entitled "Work Week Groups," is the section most relevant to this opinion. Section 10 is located at <http://www.calhr.ca.gov/Pay%20Scales%20Library/PS_Sec_10.pdf> [as of June 27, 2019] (Section 10). All Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.

specifically, the FLSA (29 U.S.C. § 201 et seq.).[5] The FLSA imposes a federal minimum wage (*id.*, § 206) and overtime compensation requirement (*id.*, § 207). It generally defines overtime as "a workweek longer than forty hours," and it requires payment "at a rate not less than one and one-half times the regular rate" for such work. (*Id.*, § 207(a)(1).) But the FLSA includes several exemptions from its overtime requirement, including one for the employment, by a public agency, of fire suppression or law enforcement personnel (*id.*, § 207(k) (section 7(k))).

The latter exemption is sometimes referred to as the "section 7(k) exemption" because it appears in section 7(k) of the FLSA, a provision that is codified as section 207(k) of title 29 of the United States Code. In the case of law enforcement personnel (a category that includes correctional employees), the section 7(k) exemption requires that the employee receive overtime compensation "at a rate not less than one and one-half times the regular rate" for any work in excess of 171 hours in a work period of 28 consecutive days (or a proportionately lesser number of hours in a shorter work period). (29 U.S.C. § 207(k)(1)(B); 29 C.F.R. § 553.230(b) (2018); see Fire Protection and Law Enforcement Employees of Public Agencies; Study of Average Number of Hours Worked, 48 Fed. Reg. 40518–40519 (Sept. 8, 1983) [describing how the 171-hour limit was determined].)

---

[5] Federal law does not preempt state law in this area, and therefore state law is controlling to the extent its protections exceed those of federal law. (*Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 554; *Morillion, supra*, 22 Cal.4th at p. 592; *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 566–568.)

As already noted, employees of the state government are not subject to Wage Order No. 4's overtime compensation section. (Wage Order No. 4, § 1(B).) Instead, CalHR has authority to define overtime compensation for state government employees (Gov. Code, §§ 19843, 19844, 19845, 19849), and more particularly, CalHR "is authorized to provide for overtime payments *as prescribed by the* [*FLSA*]" (*id.*, § 19845, subd. (a), italics added). Pursuant to that authority, Section 10 of the Pay Scale Manual refers to "WORK WEEK GROUPS ESTABLISHED UNDER FAIR LABOR STANDARDS ACT (FLSA)," and directly under that heading, the Manual establishes Work Week Group 2. Under the subheading "Determination of Coverage under FLSA," the Manual provides that "[t]he provisions of Work Week Group 2 are made applicable to all [employment] classes which are determined by the Director of [CalHR] to include positions *subject to the FLSA.*" (Italics added.) All the job classifications that are at issue in this litigation — both those of the represented plaintiffs and those of the unrepresented plaintiffs — are assigned to Work Week Group 2.[6]

These same provisions of Section 10 of the Pay Scale Manual also incorporate the FLSA's definition of compensable

---

[6] As originally certified, the plaintiff class included employees whose job classification was "Correctional Counselor II (Supervisor)." That job classification comes within Work Week Group E, meaning "white-collar" employees who are not eligible for overtime compensation and whose salary constitutes full compensation for all hours worked. By order dated May 29, 2014, the trial court excluded "Correctional Counselor II (Supervisor)" from the subclass of unrepresented plaintiffs, and the plaintiffs with that job classification were dismissed from this action.

work time, stating that "[f]or the purpose of identifying hours worked *under the provisions of the FLSA,* only the time spent which is *controlled or required by the State and pursued for the benefit of the State* need be counted." (Italics added.) This definition, which expressly references the FLSA, is drawn nearly verbatim from the high court's decision in *Tennessee Coal Co. v. Muscoda Local.* (1944) 321 U.S. 590 (*Tennessee Coal*), which defines FLSA-regulated work as "physical or mental exertion (whether burdensome or not) *controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer* and his business." (*Tennessee Coal*, at p. 598, italics added.) Thus, it is clear that the Pay Scale Manual intends the FLSA's definition of compensable work time to apply.[7]

---

[7]  The text of the FLSA does not, itself, define compensable work time. Instead, the high court has done so in several decisions interpreting the FLSA, and the high court's definition has since been summarized in an interpretive bulletin issued by the United States Department of Labor. That bulletin provides in full: "The United States Supreme Court originally stated that employees subject to the act must be paid for all time spent in 'physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.' (*Tennessee Coal, Iron & Railroad Co.* v. *Muscoda Local No. 123*, 321 U.S. 590 (1944)) Subsequently, the Court ruled that there need be no exertion at all and that all hours are hours worked which the employee is required to give his employer, that 'an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired, quite as much as service itself,

The Pay Scale Manual's definition of compensable work time — like that of Wage Order No. 4 — uses the word "control[]." Nonetheless, the two definitions differ on a point that is critical to the parties' dispute. The Pay Scale Manual's definition is expressly based on the FLSA definition, and the FLSA, by its terms, *excludes* entry-exit walk time from coverage. That exclusion is a result of Congress's enactment, in 1947, of the Portal-to-Portal Act (29 U.S.C. § 252 et seq.). The Portal-to-Portal Act states that, except when a contract or custom provides otherwise, "no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938 . . . on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee . . . [¶] (1) *walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform*, and [¶] (2) *activities which are preliminary to or postliminary to said principal activity or activities*, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular

_____

and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer.' (*Armour & Co.* v. *Wantock*, 323 U.S. 126 (1944); *Skidmore* v. *Swift*, 323 U.S. 134 (1944)) The workweek ordinarily includes 'all the time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed work place'. (*Anderson* v. *Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)) The Portal-to-Portal Act did not change the rule except to provide an exception for preliminary and postliminary activities. See [29 C.F.R.] § 785.34 [(2018)]." (29 C.F.R. § 785.7 (2018).)

workday at which he ceases, such principal activity or activities. . . ." (*Id.*, § 254(a), italics added.) The parties refer to this FLSA definition of compensable work time as the "first principal activity standard."

Plaintiffs' petition for review does not argue that entry-exit walk time is compensable under the constraints the Portal-to-Portal Act placed on the FLSA; rather, it argues that the FLSA definition of compensable work time does not apply. Therefore, we proceed under the assumption that under federal law, entry-exit walk time is *not* compensable. (See *Integrity Staffing Solutions, Inc. v. Busk* (2014) 574 U.S. ___, ___ [135 S.Ct. 513, 519] ["We hold that an activity is integral and indispensable to the principal activities that an employee is employed to perform — and thus compensable under the FLSA — if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities. *Because the employees' time spent waiting to undergo and undergoing* [*the employer's*] *security screenings* [*when leaving work each day*] *does not meet these criteria, we reverse the judgment of the Court of Appeals.*" (italics added)].)

In summary, this case involves a conflict between two regulatory schemes. Wage Order No. 4 regulates the minimum wage the state government must pay its rank-and-file employees, and it defines compensable work time in a broad way that arguably includes both types of walk time at issue in this litigation. (See *Morillion, supra*, 22 Cal.4th at pp. 587–588.) At the same time, the Pay Scale Manual sets forth the regular and overtime compensation that the state government must pay to certain classes of its employees (including plaintiffs' classes), and in so doing, it expressly adopts the FLSA's narrower

definition of compensable work time, a definition that, by its terms, excludes entry-exit walk time.

## C. The Trial

As noted, the parties stipulated that the trial could proceed in multiple phases. In the first phase, several threshold questions that were potentially dispositive of plaintiffs' claims were tried to the court. These questions included: (1) whether plaintiffs' compensable work time was properly determined according to the "control standard" (i.e., the standard that applies under the state's wage orders) or according to the "first principal activity . . . standard" (i.e., the standard that applies under the constraints the Portal-to-Portal Act placed on the FLSA), and also whether the represented plaintiffs agreed to application of the narrower federal standard; (2) whether the duty to pay plaintiffs the minimum wage was properly determined by California minimum wage law (including Wage Order No. 4's broad definition of compensable work time) or by federal minimum wage law (including the FLSA's narrower definition of compensable work time), and also whether the represented plaintiffs agreed to the application of federal minimum wage law and whether any such agreement is enforceable; and (3) whether an employee of the state can bring a common law breach of contract claim against the state for failure to pay overtime compensation that has been earned, and if so, what contractually enforceable overtime policies existed.

The evidence at the first phase of the trial established the following facts.

### 1. The Represented Plaintiffs

The represented plaintiffs are members of State Bargaining Unit 6, which covers state correctional employees,

and they are represented by the California Correctional Peace Officers Association (CCPOA). The CCPOA and the state have negotiated several memoranda of understanding (MOUs), but the MOU in effect from July 1, 1998 to June 30, 1999 (the 1998–1999 MOU) was the first to include a section 7(k) schedule. Specifically, the 1998–1999 MOU contained a section entitled "7k Exemption," which provided for a work schedule of 168 hours in a recurring 28-day work period.

The "7k Exemption" section of the 1998–1999 MOU began with an express reference to the FLSA: "CCPOA and the State agree that the [represented plaintiffs] are working under the provisions of Section []7k of the Fair Labor Standards Act (FLSA) and the parties acknowledge that the employer is declaring a specific exemption for these employees under the provisions specified herein." The 1998–1999 MOU then set forth the 168-hour work schedule, and it defined overtime as time worked in excess of that schedule. The 168 hours consisted of 160 hours of "on post" duty, four hours of "pre and post work activities," and four hours of "training." Regarding the four hours of "pre and post work activities," the 1998–1999 MOU stated: "CCPOA agrees that generally this is sufficient time for all pre and post work activities during each work period, and that the compensation allotted for these activities under this provision is full compensation for all of these activities."[8] The

---

[8] The trial court made a factual finding that the word "generally" was included in this provision because the state wanted to allow employees to apply for additional compensation when such compensation was needed due to the "dynamic environment" of the prison.

1998–1999 MOU further stated:  "The State and CCPOA agree that they have made a good faith attempt to comply with all requirements of the FLSA in negotiating this provision."

Significantly, the phrase "pre and post work activities" as used in the 1998–1999 MOU referred to duty-integrated walk time, not entry-exit walk time.  According to testimony from David Gilb, the state's chief negotiator, the state took the position during negotiations that the phrase encompassed activities that occurred before correctional employees arrived at their assigned work posts and after they left those posts, but the phrase only encompassed activities that began when an employee first picked up his or her equipment in the central control area of the prison facility and that ended when an employee dropped off the same equipment at the end of his or her shift.  According to Gilb, the phrase "pre and post work activities" did *not* include time spent between entering the outermost gate of a prison facility and first picking up equipment, or time spent leaving a facility after dropping off equipment.  The union initially sought compensation for such time, but the state argued that entry-exit walk time was not compensable because the parties were negotiating under the FLSA's section 7(k) exemption, and the FLSA — as amended by the Portal-to-Portal Act — did not require such compensation.

---

As regards employees in two job classifications ("Correctional Counselors I" and "Correctional Counselors II"), the 1998–1999 MOU (and subsequent MOUs between the parties) did not allocate any time for "pre and post work activities."  The trial court made a factual finding, with respect to those employees, that "neither the State nor [the union] believed that these individuals engaged in any compensable [pre- and postwork activities]."

Rather, asserted the state, compensable work time under the FLSA begins with the "first principal activity" that an employee is employed to perform. The testimony of CCPOA's chief negotiator, Stephen Weiss, confirmed that the parties did not consider entry-exit walk time to be compensable. He testified that the phrase "pre and post work activities" was not specifically defined in the MOU, "[b]ut in the conversations at the [bargaining] table, it was picking up your keys, picking up your tools, Mace, whatever was appropriate for the particular post that they were working."

During the discussions that led to the 1998–1999 MOU there was no suggestion that state wage-and-hour protections applied. The reason CCPOA did not make that argument was that, at the time of the negotiations, the state statutes setting the minimum wage and permitting private actions to enforce the minimum wage (Lab. Code, §§ 1182.11, 1182.12, 1194, 1197) only applied to the extent a wage order applied (see *Martinez*, *supra*, 49 Cal.4th at pp. 56–57), and the wage order that might apply to correctional employees — Wage Order No. 4 — expressly exempted employees of the state government from *all* its provisions. As mentioned, Wage Order No. 4 was revised in 2001, making a few of its sections, including its "Definitions" and "Minimum Wages" sections (but not its overtime section), applicable to state employees. (See Wage Order No. 4, § 1(B); see also *Sheppard*, *supra*, 191 Cal.App.4th at pp. 300–301.)

The Legislature approved the 1998–1999 MOU, and this approval was signed by the Governor and chaptered into law. (Stats. 1998, ch. 820, § 2, p. 5135.) The next MOU, which was in effect between the parties from July 1, 1999 to July 2, 2001, continued the relevant provisions of the 1998–1999 MOU, and like its predecessor, it too was approved by the Legislature by

17

way of a regularly enacted law. (Stats. 1999, ch. 778, § 6, subd. (b), p. 5613.) The MOU in effect from July 1, 2001 to July 2, 2006 (the 2001–2006 MOU) provided for a schedule of only 164 hours in a 28-day work period, with this shorter schedule going into effect on July 1, 2004. The shorter schedule was achieved by eliminating the four hours allocated to training in the previous MOUs. As with the previous MOUs, four hours remained allocated to "pre and post work activities," and the 2001–2006 MOU included the language from the previous MOUs, stating that those four hours were "sufficient time for all pre and post work activities during each work period" and "that the compensation allotted for these activities under this provision is full compensation for all of these activities." The 2001–2006 MOU also included the language from the previous MOUs, stating that the parties had made a good faith attempt to comply with the FLSA. Like its predecessors, the 2001–2006 MOU was approved by the Legislature, and this approval was signed by the Governor and chaptered into law. (Stats. 2002, ch. 1, § 2, p. 3.)

From July 2, 2006 to September 18, 2007, the parties negotiated unsuccessfully for a new MOU, and during that time, CCPOA and the state continued to give effect to the provisions of the 2001–2006 MOU. (See Gov. Code, § 3517.8, subd. (a) [authorizing employment under the terms of an expired MOU while negotiations are ongoing].) On September 18, 2007, the parties reached an impasse in their negotiations, and the state implemented the terms of its "last, best, and final offer." (See *id.*, § 3517.8, subd. (b).) Except by way of budget acts authorizing the expenditure of state funds, the terms of the state's "last, best, and final offer" were not approved by the Legislature. As regards the section 7(k) schedule, however, the

"last best, and final offer" was not different from the 2001–2006 MOU.

In late 2007, the national economy went into recession, and a steep drop in state revenues seriously impacted the state's budget.  (See *Professional Engineers*, *supra*, 50 Cal.4th at pp. 1000–1008 [describing state's fiscal crisis, which began in late 2007 and continued for several years thereafter].)  The state and CCPOA next entered into an MOU on May 16, 2011 (the 2011–2013 MOU).  This new MOU, like its predecessors, invoked section 7(k) of the FLSA, and it continued the schedule of 164 hours in a recurring 28-day work period, a schedule that expressly included four hours for "pre and post work activities."  But, by the time of the 2011–2013 MOU, the present litigation had begun.  Therefore, the 2011–2013 MOU did not include the language found in the earlier MOUs, stating that four hours constituted sufficient compensation for pre- and postwork activities.  The MOU stated in a side letter that "nothing in this MOU shall have prejudicial effect to either side's arguments in Stoetzl v. State of California" (referring to the present litigation).  The 2011–2013 MOU, like its predecessors, was approved by the Legislature, and this approval was signed by the Governor and chaptered into law.  (Stats. 2011, ch. 25, § 2, p. 684.)

### 2.  *The Unrepresented Plaintiffs*

Labor relations between the state and the unrepresented plaintiffs are governed by, among other things, the Bill of Rights for State Excluded Employees (Gov. Code, § 3525 et seq.), which imposes "meet and confer" obligations on the state (*id*., § 3533), but which does not provide for collective bargaining through an exclusive employee representative (*id*., §§ 3530, 3531).

Therefore, no MOU governs the wages and hours of the unrepresented plaintiffs. Instead, CalHR, pursuant to its delegated legislative authority to set wages and hours for state workers (*id*., §§ 19826, 19843, 19844, 19845, 19849), has adopted the Pay Scale Manual. As discussed, state law expressly permits CalHR "to provide for overtime payments as prescribed by the [FLSA]" (Gov. Code, § 19845, subd. (a)), and Section 10 of the Pay Scale Manual does so for specified job classifications — including all the job classifications that are the subject of this litigation — by creating "Work Week Group 2" under the heading "WORK WEEK GROUPS ESTABLISHED UNDER FAIR LABOR STANDARDS ACT (FLSA)."

Section 10 of the Pay Scale Manual divides Work Week Group 2 into three categories: (1) "employees in classes not eligible for exemption under Section 7K of the FLSA"; (2) "employees in law enforcement classes, for which exemption under Section 7K of the FLSA is claimed"; and (3) "employees in fire suppression classes, for which exemption under Section 7K of the FLSA is claimed." As to each of these categories, the Pay Scale Manual adopts work schedules that derive directly from the FLSA (see 29 U.S.C. § 207(a)(1); 29 C.F.R. § 553.230 (2018)), thus confirming the intent of CalHR to adopt FLSA standards for Work Week Group 2. The job classifications of the unrepresented plaintiffs all fall within the *first* of the three Work Week Group 2 categories. Therefore, although their job classifications are included in Work Week Group 2, the unrepresented plaintiffs are *not* eligible for the FLSA's section 7(k) exemption. Rather, for them, the Pay Scale Manual defines overtime "as all hours worked in excess of 40 hours in a period of 168 hours or seven consecutive 24-hour periods," which, of

course, is how the FLSA defines overtime when no special exemption is invoked (see 29 U.S.C. § 207(a)(1)).

### D.    The Trial Court's Ruling

The gist of plaintiffs' claims is that the state did not adequately compensate them for walk time. The trial court rejected that assertion, ruling in favor of the defendants on all issues.

As to the represented plaintiffs, the trial court concluded that the "first principal activity" standard that defines compensable work time for purposes of the FLSA governs plaintiffs' claims. The trial court based its conclusion on the language of the MOUs (which incorporated the FLSA's section 7(k) schedule), testimonial evidence that the parties agreed, during negotiations, to adopt the FLSA's "first principal activity" standard, and the fact that the MOUs were approved by the Legislature, thus superseding conflicting laws of more general application.

As to the unrepresented plaintiffs, the trial court concluded that, by assigning various job classifications to Work Week Group 2, CalHR had determined that those job classifications should be governed by the FLSA, and more specifically by the "first principal activity" standard that defines compensable work time for purposes of the FLSA. The trial court further concluded that, in doing so, CalHR acted within its express delegated authority under Government Code section 19845, subdivision (a). The trial court rejected plaintiff's argument that, by using the word "control[]" in the Pay Scale Manual's definition of compensable work time applicable to Work Week Group 2, CalHR had indicated its intent to incorporate the "control" standard that is used to define

21

compensable work time under the state's wage orders. On the contrary, concluded the trial court, CalHR took the word "control[]" directly from the definition of compensable work time that applies under the FLSA (see *Tennessee Coal, supra*, 321 U.S. at p. 598), and therefore the word must be read in light of, and consistent with, the "first principal activity" standard.

In the trial court's view, the foregoing conclusions disposed of plaintiffs' minimum wage cause of action, which was based on the assertion that the "control" standard of the state's wage orders, not the "first principal activity" standard of the FLSA, defined compensable work time for purposes of the duty to pay the minimum wage. The trial court reasoned that by approving the MOUs (in the case of the represented plaintiffs) and by authorizing CalHR to establish work week groups that were subject to the FLSA's overtime standards (in the case of the unrepresented plaintiffs), the Legislature enacted specific laws that superseded the state's more general minimum wage laws.

As to plaintiffs' overtime claims based on common law breach of contract, the trial court ruled that plaintiffs' claims were subject to the rule that the terms and conditions of public employment are controlled by statute and ordinance, not by contract, and that plaintiffs had not established the existence of a contractual agreement to pay overtime compensation other than as provided in the MOUs.

Based on the foregoing conclusions, which disposed of all of plaintiffs' remaining claims, the trial court declined to reach defendants' contentions that plaintiffs had failed to exhaust administrative remedies and had failed to comply with the government claims statutes (Gov. Code, § 900 et seq.).

### E.    The Court of Appeal Decision

The Court of Appeal affirmed the trial court as to the represented plaintiffs, but it reversed the trial court as to the unrepresented plaintiffs.

As to the represented plaintiffs, the Court of Appeal reasoned that the Legislature's approval of the MOUs, and the Governor's signature, effectively made those agreements into laws that, because of their specificity, superseded any conflicting general laws that might otherwise apply. (*Stoetzl v. State of California* (2017) 14 Cal.App.5th 1256, 1272, review granted Nov. 29, 2017, S244751 (*Stoetzl*).)  The MOUs expressly stated that the represented plaintiffs were working under the "7K Exemption" of the FLSA, and they also made express provision for duty-integrated walk time, allotting an aggregate of four compensable hours to such walk time in each recurring 28-day work period. (*Stoetzl*, at p. 1273.)  In addition, in negotiating the 1998–1999 MOU, both the parties understood that they were proceeding under the FLSA (*Stoetzl*, at p. 1273), and they further understood that the state did not consider entry-exit walk time to be compensable under the FLSA (*Stoetzl*, at p. 1273).  The text of all the MOUs reflected those understandings, thus carrying forward the negotiating history of the 1998–1999 MOU, and the Legislature's approval of the MOUs gave those understandings the status of law.  Therefore, in the Court of Appeal's view, the trial court had properly concluded that the FLSA governed the represented plaintiffs' right to compensation. (*Stoetzl*, at p. 1273.)  That conclusion disposed of the represented plaintiffs' minimum wage cause of action (*ibid.*), their overtime compensation cause of action based on breach of contract (*id.* at p. 1278–1279), and their overtime

compensation cause of action based on Labor Code sections 222 and 223 (*Stoetzl*, at p. 1279).

As to the unrepresented plaintiffs, the Court of Appeal concluded that their minimum wage claims should be allowed to proceed. (*Stoetzl*, *supra*, 14 Cal.App.5th at p. 1276, review granted.) The court reasoned that it needed to harmonize the requirements of Wage Order No. 4, whose definition of compensable work time expressly applies to rank-and-file employees of the state government, with CalHR's Pay Scale Manual, which likewise defines compensable work time for specified classes of state government employees, including plaintiffs' classes. (*Stoetzl*, at p. 1275.) The Court of Appeal noted, in this regard, that the Pay Scale Manual is not a legislative enactment, whereas the wage orders "have 'the same dignity as statutes.' " (*Ibid*.) The Court of Appeal further noted that the Manual's definition of compensable work time uses the word "control[]," which, in the Court's view, suggested a parallel to the "control" standard that applies under the state's wage orders. (*Id*. at pp. 1275–1276.) Moreover, the Court of Appeal noted that the Manual's definition of compensable work time, although drawn nearly verbatim from FLSA definition, does not expressly exclude entry-exit walk time. (*Id*. at p. 1276.) Finally, the Court of Appeal noted that the Pay Scale Manual does not contain an express provision stating that Wage Order No. 4 does *not* apply, whereas Wage Order No. 4 expressly states that its "Definitions" and "Minimum Wages" sections apply to state government employees. (*Stoetzl*, at p. 1276.)

Therefore, the Court of Appeal concluded that Wage Order No. 4's broad definition of compensable work time governed the state's obligation to pay the minimum wage to the unrepresented plaintiffs. The Court said: "We may reasonably

construe the regulatory schemes to mean that entitlement to overtime compensation is controlled by the FLSA but that the meaning of 'hours worked' is governed by Wage Order 4. Such a construction does violence to neither regulatory scheme. [¶] Accordingly, we conclude the unrepresented employees are entitled to [minimum wage] pay for all hours worked under the applicable California standard rather than the FLSA's standard." (*Stoetzl*, *supra*, 14 Cal.App.5th at p. 1276, review granted.)

As to the breach of contract claims of the unrepresented plaintiffs — claims that sought *overtime* compensation for walk time — the Court of Appeal concluded that those claims, too, should be allowed to proceed because the unrepresented plaintiffs "are entitled to compensation for all hours worked under California's broader standard." (*Stoetzl*, *supra*, 14 Cal.App.5th at p. 1279, review granted.) The Court of Appeal held, however, that the trial court properly rejected the unrepresented plaintiffs' Labor Code section 222 cause of action, because that statute only applies where there is a collective bargaining agreement in force between the parties. (*Stoetzl*, at pp. 1279–1280.) Likewise, it properly rejected their Labor Code section 223 cause of action, because that statute is concerned with secret deductions and kick-backs, an issue not presented by the allegations of plaintiffs' operative complaints. (*Stoetzl*, at pp. 1280–1281.)

Both sides petitioned for review, and we granted both petitions.

## II. DISCUSSION

Plaintiffs seek additional compensation for walk time, basing their claims on three legal theories set forth in three

causes of action: (1) failure to pay the minimum wage in violation of state minimum wage laws; (2) failure to pay overtime compensation in breach of common law contractual obligations; and (3) failure to pay overtime compensation in violation of Labor Code sections 222 and 223.[9] We address each of these causes of action in turn.

## A. The Minimum Wage Cause of Action

### 1. *The Represented Plaintiffs*

We agree with the trial court and the Court of Appeal that the represented plaintiffs agreed, through the collective bargaining process, to receive a specific amount of compensation for walk time, and the state's minimum wage laws do not entitle them to additional compensation.

Since enactment of the Ralph C. Dills Act in 1977 (the Dills Act) (Gov. Code, § 3512 et seq.), state government employees have had the right to be represented by a union and to bargain collectively over the wages, hours, and terms of employment. (Gov. Code, §§ 3512, 3515, 3515.5, 3516, 3517.)[10] The Director of CalHR represents the Governor in these negotiations (*id*., §§ 19815, subd. (b), 19815.4, subd. (g)), and once a union and the Director have reached agreement, they are

---

[9] Each of the operative complaints also alleges a cause of action for failure to keep accurate records of hours worked in violation of Labor Code section 1174, but the trial court granted judgment in favor of defendants on that cause of action, the Court of Appeal did not address it, and it was not mentioned in plaintiffs' petition for review in this court. Therefore, only the three causes of action for unpaid compensation are before us.

[10] Managerial, confidential, and supervisory employees as defined in subdivisions (e), (f), and (g) of Government Code section 3513 are excluded from this right. (*Id*., § 3513, subd. (c).)

required to prepare an MOU memorializing the terms of that agreement (*id.*, § 3517.5). Significantly, "the Dills Act is a ' "supersession statute" ' [citation], meaning that when a provision of an MOU conflicts with an otherwise applicable statutory provision governing the terms and conditions of employment, the provision of the MOU generally 'supersedes' or prevails over the terms of the otherwise applicable statute, without any need for further legislative approval of the conflicting MOU provision. [Citation.]" (*Professional Engineers, supra*, 50 Cal.4th at p. 1018.) Statutory provisions that are automatically superseded by an MOU are listed in Government Code sections 3517.6 and 3517.61. If, however, an MOU requires the expenditure of state funds or if its implementation requires amendment of statutory provisions that are not among those listed in Government Code sections 3517.6 and 3517.61, it must be approved by the Legislature. (Gov. Code, §§ 3517.5, 3517.6, subd. (b), 3517.61.)

The represented plaintiffs agreed through the foregoing collective bargaining process to a specific amount of compensation for duty-integrated walk time. Specifically, they agreed to four hours' pay for "pre and post work activities" in a recurring 28-day work period, and the record supports the trial court's finding that the phrase "pre and post work activities" was used by the parties to refer to duty-integrated walk time.[11]

---

[11] The trial court's order stated: "During bargaining, the parties understood that [pre- and postwork activities] included (1) the time at the beginning of the work shift from the point when an employee picked up his/her keys and tools to the time when the employee reported to his/her post and, (2) the time at the end of the work shift, from the point the employee departs

27

Moreover, CCPOA expressly conceded in the text of three of the four MOUs at issue here "that generally [four hours] is sufficient time for all pre and post work activities during each work period, and that the compensation allotted for these activities under this provision is full compensation for all of these activities." Significantly, the trial court made a finding that the word "generally" was included in the foregoing stipulation because the state wanted to allow employees to apply for *additional* compensation when such compensation was necessary due to the dynamic environment of the prison. This factual finding, too, is amply supported by testimony at trial,[12] and therefore it is not subject to being reconsidered by us on review. (See *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143 ["If the trial

_____

his/her post to the time when the employee drops off his/her keys and tools. [Pre- and postwork activities] did not include time spent by an employee traveling from the initial security gate or 'sallyport' to the point where the employee picked up his/her keys and tools. Similarly, it did not include time spent by an employee after he or she dropped off his/her keys and tools."

[12]   David Gilb testified: "In the normal course of business, once an employee picked up their equipment at what's called control, picked up their tools, and then started for their post, that we agreed that, in the normal course of business, four hours was sufficient compensation — four hours every 28-day work period was sufficient compensation for that. The word 'generally' is in there because a prison is a very dynamic environment, and issues come up where from the point you picked up your equipment until the time you actually report to your post, you may be waylaid. You may be diverted. Somebody may ask you to do an additional errand. Under those circumstances, we wanted some language in the contract that allowed basically the employees to apply and the employer to approve additional compensation when it met the requirements of the FLSA."

court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence."]; see also *Gaines v. Fidelity National Title Ins. Co.* (2016) 62 Cal.4th 1081, 1100; *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711; *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1032.) Accordingly, the word "generally" cannot be read to suggest that in some work periods duty-integrated walk time consumed more than four hours and the represented plaintiffs worked without compensation. Rather, the parties expressly agreed that four hours in 28 days was ordinarily enough time to complete the activities associated with duty-integrated walk time and that when more time was necessary, an employee could apply for it.

Although CCPOA did not make this same concession in the 2011–2013 MOU, the parties agreed in a side letter that "nothing in this [2011–2013] MOU shall have prejudicial effect to either side's arguments in Stoetzl v. State of California," referring to the present litigation. Therefore, the omission of language that had been included in all the previous MOUs, stating that four hours was generally sufficient for pre- and postwork activities, cannot be construed as an indication that four hours had somehow *ceased* to be sufficient, at least under ordinary circumstances. In addition, there is no allegation that the represented plaintiffs were barred from applying for additional compensation if such compensation became necessary due to the "dynamic environment" of the prison. As noted, the trial court found that the state permitted employees to apply for such additional compensation. Therefore, the represented plaintiffs cannot, as a factual matter, show that duty-integrated walk time ever went uncompensated.

The represented plaintiffs also agreed through the collective bargaining process to forgo compensation for entry-exit walk time. Each of the MOUs included a heading that read "Entire Agreement," followed by a provision that stated: "This [MOU] sets forth the full and entire understanding of the parties regarding the matters contained herein . . . ." Compensation was certainly one of the "matters contained" (i.e., provided for) in each of the MOUs. In fact, the preamble of each of the MOUs stated: "This AGREEMENT . . . has as its purpose . . . the establishment of *rates of pay*, hours of work, and other terms and conditions of employment." (Italics added.) Therefore, pursuant to the integration clauses, the MOUs "set[] forth the full and entire understanding of the parties regarding" compensation, precluding any forms of compensation not addressed in the MOUs. More to the point, each of the MOUs made specific provision for compensating pre- and postwork activities, providing four hours' pay for such activities in a recurring 28-day work period. Because the MOUs "set[] forth the full and entire understanding of the parties regarding the matters contained [t]herein," and because compensation for pre- and postwork activities was one of the "matters contained" in each of the MOUs, the MOUs precluded compensation for entry-exit walk time by not making any provision for it.[13]

---

[13] Significantly, the parties expressly bargained over entry-exit walk time. As the trial court explained, the CCPOA suggested during negotiations over the 1998–1999 MOU that the state should compensate entry-exit walk time, and the state rejected the idea, pointing out that the parties were negotiating under the FLSA, which excludes entry-exit walk time from compensable work time. It is true that the legal landscape

Moreover, the MOUs were all approved by the Legislature, with this approval signed by the Governor and chaptered into law. Thus, the MOUs became legislative enactments that because of their specificity, supersede the more general state laws on which the represented plaintiffs base their claims. (See, e.g., *Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 634 [in the event of a conflict, specific provisions ordinarily prevail over general ones].) It would be unfair to allow the represented plaintiffs, who negotiated a favorable deal at the bargaining table and who agreed to certain concessions as part of that deal, including concessions concerning compensation for walk time, to avoid those concessions after the Legislature passed a series of special laws approving their agreement.

This is not a case in which a party to a labor agreement agreed to waive state law protections that are not subject to waiver. (Cf. *Gentry v. Superior Court* (2007) 42 Cal.4th 443, 455 ["By its terms, the rights to the legal minimum wage and legal overtime compensation conferred by the statute are unwaivable."]; *Hoover v. American Income Life Ins. Co.* (2012) 206 Cal.App.4th 1193, 1208 ["[T]he rights accorded by [Labor Code] section[] . . . 1194 . . . may not be subject to negotiation or waiver."]; *Grier v. Alameda–Contra Costa Transit Dist.* (1976) 55 Cal.App.3d 325, 335 ["[F]ull payment of accrued wages is an

---

changed after the IWC amended Wage Order No. 4, causing the "Entire Agreement" provision of the MOUs to take on a new significance (see conc. & dis. opn. of Liu, J., *post*, pp. 4–7), but given the prevailing agreement, these facts mean only that the represented employees needed to negotiate a change in the language of the MOUs if, based on the amended wage order, they wanted minimum wage compensation for entry-exit walk time.

important state policy, enacted for protection of employees generally. As such, it is not to be avoided by the terms of a private agreement."].) Rather, this is a case in which a party to a labor agreement agreed, subject to legislative approval, to certain specified terms of employment, *and the Legislature then enacted a special law approving the agreed-upon terms*. Having expressly agreed to specific terms of compensation for pre- and postwork activities, and having declared those terms to be the "entire agreement" of the parties concerning compensation for such activities, and, most important, having received legislative approval of the agreement, the represented plaintiffs cannot credibly argue that they should now be released from the terms of the agreement and granted additional compensation based on the general laws of the state.

Of course, there was no special law approving the terms of defendants' "last, best, and final offer" (see Gov. Code, § 3517.8, subd. (b)), which was in effect between the parties from September 18, 2007 until May 16, 2011. During that time period, the Legislature fully funded the state's obligation under the last, best, and final offer, but it did not otherwise approve that offer, as it did the MOUs. The represented plaintiffs argue, on that account, that their claims for additional minimum wage compensation should prevail at least as to the 44-month period from September 18, 2007 until May 16, 2011.

Plaintiffs, however, misread the law that applies to a last, best, and final offer. As noted, the Dills Act requires that an MOU be presented to the Legislature for approval if it requires the expenditure of state funds or if its implementation requires the amendment of statutory provisions that are not among those provisions that the MOU automatically supersedes. In *Department of Personnel Administration v. Superior Court*

*(Greene)* (1992) 5 Cal.App.4th 155 (*Greene*), the Court of Appeal considered whether, in the context of the state's 1991–1992 fiscal crisis, CalHR's predecessor could, after bargaining to an impasse, unilaterally impose its last, best, and final offer regarding wages and health care contributions. (*Id.* at pp. 162– 164.) The court held that when an MOU expires, its supersession of conflicting state laws comes to an end, and therefore those state laws come back into full effect. (*Id.* at p. 176.) Accordingly, the court concluded that the state was not permitted to implement its last, best, and final offer insofar as that offer included terms that conflicted with formerly superseded state laws. (*Id.* at pp. 172, 174, 185.)

The holding of *Greene, supra*, 5 Cal.App.4th 155, created problems for state employees because the expired MOU often offered greater employee protections than the general state laws that came back into full effect upon the MOU's expiration. Of particular concern to state employee unions was the continuing ability to collect fair share fees[14] and to rely on arbitration to resolve disputes. The CCPOA therefore sponsored legislation to set aside the holding of *Greene*. (See, e.g., Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 683 (1999–2000 Reg. Sess.) as amended Aug. 30, 2000, pp. 2–4; Assem. Com. on Appropriations, Analysis of Sen. Bill No. 683 (1999–2000 Reg. Sess.) as amended Aug. 19, 1999, pp. 1–2; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 683 (1999–2000 Reg. Sess.) as amended April 19, 1999, pp. 2–5.) That legislation added section 3517.8 to the Government

---

[14] Fair share fees are fees imposed on nonunion employees to ensure that they pay a portion of the cost of collective bargaining.

Code — sometimes referred to as the "evergreen" law — addressing the situation where an MOU expires with no new MOU in place.

If, upon expiration of the MOU, negotiations over a new MOU are ongoing, subdivision (a) of Government Code section 3517.8 requires the parties to give effect to the terms of the expired MOU, including terms that supersede existing law, with no need for additional legislative action. Next, if the parties reach an impasse in their negotiations, subdivision (b) of Government Code section 3517.8 authorizes the state to implement the terms of its last, best, and final offer. In the latter case, however, "[a]ny proposal in the state employer's last, best, and final offer that, if implemented, *would conflict with existing statutes or require the expenditure of funds shall be presented to the Legislature for approval* and, if approved, shall be controlling without further legislative action . . . ." (Gov. Code, § 3517.8, subd. (b), italics added.)

The represented plaintiffs argue that here, because the state's last, best, and final offer was not approved by the Legislature, there was no supersession of conflicting state laws, and therefore their claims for additional minimum wage compensation should prevail at least as to the 44-month impasse period in which no MOU was in place. What plaintiffs overlook is that the legislative approval required by Government Code sections 3517.6, subdivision (b), 3517.61, and 3517.8, subdivision (b) can, at least in some circumstances, be satisfied by a budget act authorizing the expenditure of state funds. As we explained in *Professional Engineers*, "[u]nder the Dills Act, it is clear that an MOU, once approved by the Legislature (either directly — see [Gov. Code], § 3517.5 — *or through the appropriation of sufficient funds to pay the agreed-upon*

*employee compensation*), governs the wages and hours of the state employees covered by the MOU." (*Professional Engineers*, *supra*, 50 Cal.4th at p. 1040, italics added; see *id*. at p. 1043 ["the Legislature retain[s] its ultimate control (*through the budget process*) over expenditures of state funds required by the provisions of an MOU" (italics added)]; *ibid.* ["by enacting appropriations for employee compensation in the [budget act] . . . , the Legislature approved that level of compensation"].)

In fact, our opinion in *Professional Engineers* went even further, stating that the Legislature can use appropriations bills to modify the terms of state employment even while an MOU is in effect. Our decision in *Professional Engineers* arose in the context of the state fiscal crisis that began in late 2007 and continued for several years thereafter. (*Professional Engineers*, *supra*, 50 Cal.4th at pp. 1000–1008.) In December 2008, the Governor issued an executive order instructing the Department of Personnel Administration (now CalHR) to implement a mandatory two-day-a-month unpaid furlough of most executive branch employees. (*Id*. at p. 999.) In reviewing the legality of that mandatory furlough, we noted that when the Legislature revised the Budget Act of 2008, it reduced the relevant appropriation to a level that reflected the Governor's furlough plan. (*Id*. at 1043.) We said: "By reducing the appropriation for employee compensation, the Legislature no longer had 'fully funded' the provisions of the MOU's supporting the higher level of pay that previously had been approved, *and thus . . . the provisions of the applicable MOU's . . . no longer were effective.*" (*Ibid.*, italics added; see *Service Employees Internat. Union, Local 1000 v. Brown* (2011) 197 Cal.App.4th 252, 263 ["*Professional Engineers* made it clear that it is the Legislature . . . which has . . . the final say [] in fixing the

compensation paid to represented state employees, with that final say often being expressed in the budget process."].)

The holdings of *Professional Engineers* suffice to answer the represented plaintiffs' argument that there was no legislative approval here. (See also *Brown v. Superior Court* (2011) 199 Cal.App.4th 971, 998 [appropriations bills satisfy legislative approval required by § 3517.8, subd. (b)].)[15] Because the last, best, and final offer that governed the represented plaintiffs' employment during the 44 months from September 18, 2007, until May 16, 2011, was funded by the Legislature, it was legislatively approved, and it therefore superseded conflicting state laws.

Accordingly, we agree with the trial court and the Court of Appeal that the represented plaintiffs are not entitled to additional minimum wage compensation for either duty-integrated walk time or entry-exit walk time. The MOUs made specific provision for duty-integrated walk time, and the trial court's findings of fact, which are supported by trial testimony, do not suggest that duty-integrated walk time ever went uncompensated. Although the MOUs did not specifically refer to entry-exit walk time, they expressly stated that they constituted the entire understanding of the parties regarding

---

[15] This conclusion — allowing the state to implement its last, best, and final offer in the case of an impasse in negotiations — does not unfairly tilt the balance in favor of the state in labor negotiations. Government Code section 3517.8, subdivision (b) also provides in relevant part: "Implementation of the last, best, and final offer does not relieve the parties of the obligation to bargain in good faith and reach an agreement on a memorandum of understanding if circumstances change, and does not waive rights that the recognized employee organization has under this chapter."

the matters they addressed, and compensation for pre- and postwork activities was one of those matters. Moreover, the Legislature's enactment of special laws approving the MOUs (and its decision to fund the state's last, best, and final offer) precludes the represented plaintiffs' reliance on more general state laws to support their minimum wage claims.

### 2. *The Unrepresented Plaintiffs*

As noted, the trial court concluded, as to the unrepresented plaintiffs, that the specific statutes authorizing CalHR to set the wages and hours of employees of the state government (see Gov. Code, §§ 19826, 19843, 19844, 19845, 19849) — and, in particular, to provide for overtime compensation as prescribed by the FLSA (see *id.*, § 19845, subd. (a)) — superseded the more general statutes authorizing the IWC to regulate the wages and hours of public and private employees working in the state. The Court of Appeal rejected that conclusion, reasoning that CalHR intended to incorporate into its Pay Scale Manual the definition of compensable work time that appears in Wage Order No. 4 and, therefore, that the wage order definition applied not only to plaintiffs' minimum wage claims but also to their overtime compensation claims based on breach of contract. We agree with the conclusion of the trial court and disagree with the conclusion of the Court of Appeal.

The Court of Appeal suggested that this case pitted an IWC wage order that has the "dignity" of statutory law against a provision of CalHR's Pay Scale Manual that does not. (See *Stoetzl*, *supra*, 14 Cal.App.5th at p. 1275, review granted.) That characterization is not completely accurate, however. Rather, we are confronted here with two competing statutory schemes,

each broadly authorizing administrative action. It is true that the IWC's wage orders are entitled to extraordinary deference and that they must be harmonized, to the extent possible, with conflicting laws and regulations, but that harmonization does not mean that the wage orders must invariably prevail over the regulations of other agencies.

On the one hand, the Legislature empowered the IWC to regulate the wages and hours of employees generally. (Stats. 1913, ch. 324, § 6, pp. 634–635; Stats. 1972, ch. 1122, § 13, p. 2156; Stats. 1973, ch. 1007, § 8, p. 2004; see *Martinez, supra*, 49 Cal.4th at pp. 52–57 [describing the history of the IWC]; *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 700–701 [describing the expansion of the IWC's jurisdiction to cover all employees].) Pursuant to that authority, the IWC issued wage orders that, as relevant here, (1) define compensable work time, (2) establish a minimum wage, (3) mandate overtime compensation, and (4) expressly apply the minimum wage section (but not the overtime section) to rank-and-file employees of the state government.

On the other hand, the Legislature empowered CalHR to set the wages and hours of employees of the state government (Gov. Code, §§ 19826, 19843, 19844, 19845, and 19849), including assigning various job classifications to work week groups for purposes of defining compensable work time and regulating overtime compensation (*id.*, § 19843, subd. (a)). Moreover, the Legislature expressly authorized CalHR to provide for overtime payments as prescribed by the FLSA. (*Id.*, § 19845, subd. (a).) In California, the Legislature has ultimate responsibility for setting the terms and conditions of state employment, and therefore CalHR's authority in this area is unquestionably legislative, "emanat[ing] from the Legislature's

delegation of . . . its legislative authority." (*Professional Engineers*, *supra*, 50 Cal.4th at p. 1015.)

Given these two broad delegations of quasi-legislative authority, it is not obvious that, in the case of a direct conflict, the decisions of the IWC should invariably prevail over those of CalHR. The Court of Appeal reasoned that the IWC's wage orders "have 'the same dignity as statutes,' " whereas "the Pay Scale Manual is not a legislative enactment" (*Stoetzl*, *supra*, 14 Cal.App.5th at p. 1275, review granted), but the underlying basis for treating the wage orders like statutes is the Legislature's broad delegation of legislative power to the IWC (see *Martinez*, *supra*, at p. 61), and the Legislature's delegation of legislative power to CalHR is likewise very broad. We are not dealing here with an ambiguous statutory phrase or standard that CalHR must clarify, nor has the Legislature given CalHR much specific guidance as to what terms of employment it should adopt. Rather, we are dealing with a broad legislative gap — the terms of employment, including specific salary ranges, for thousands of state job classifications — and CalHR has filled that legislative gap, exercising its delegated legislative authority. Therefore, the provisions of the Pay Scale Manual at issue here are best characterized as quasi-legislative rules. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10–11 [defining quasi-legislative rules as those that result from a delegation of legislative power, not those that merely represent the agency's view of a statute's meaning]; *id.* at p. 6 fn. 3 [noting that "the terms 'quasi-legislative' and 'interpretive' . . . designate opposite ends of an administrative continuum, depending on the *breadth of the authority* delegated by the Legislature" (italics added)]; accord, *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 798–799; see also *American*

*Mining Congress v. Mine Safety & Health Administration* (D.C.Cir.1993) 995 F.2d 1106, 1110 ["[T]he dividing line [between interpretive and quasi-legislative regulations] is the necessity for agency legislative action . . . [.] [A] rule supplying that action will be legislative . . . , and an interpretation that spells out the scope of an agency's or regulated entity's pre-existing duty . . . will be interpretive . . . ."].) As such, the provisions of the Pay Scale Manual, like the IWC's wage orders, "have the dignity of statutes." (*Yamaha*, at p. 10.)[16]

It is true that IWC wage orders must, when possible, be harmonized with statutes. (*Brinker*, *supra*, 53 Cal.4th at p. 1027.) It is also true that the Legislature's authority to delegate its legislative power to the IWC is expressly recognized in the state's Constitution. (Cal. Const., art. XIV, § 1.) But contrary to the conclusion of the Court of Appeal (*Stoetzl*, *supra*, 14 Cal.App.5th at p. 1275, review granted), neither of these points establishes that IWC wage orders prevail over the Pay Scale Manual. Despite the constitutional authorization, the IWC, in adopting and amending the wage orders, still only exercised authority delegated to it from the Legislature, as did CalHR in this area, so the IWC's wage orders and the Pay Scale Manual must be harmonized with statutes and with each other to the extent possible.

We also reject the Court of Appeal's suggestion that, by using the word "control[]," the Pay Scale Manual intended to

---

[16]   The broad deference owed to *all* properly adopted quasi-legislative regulations, including the obligation to afford them the dignity of statutes, is a point that the author of the concurring and dissenting opinion has noted in the past. (See *Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 415.)

incorporate Wage Order No. 4's broad definition of compensable work time, a definition that also happens to use the word "control." (See *Stoetzl*, *supra*, 14 Cal.App.5th at pp. 1275–1276, review granted.) Rather, the Pay Scale Manual's definition of compensable work time expressly incorporates the FLSA's definition. Government Code section 19845, subdivision (a) authorizes CalHR "to provide for overtime payments *as prescribed by the* [*FLSA*]." (Italics added.) CalHR exercised that authority in Section 10 of the Pay Scale Manual, which includes the heading "WORK WEEK GROUPS ESTABLISHED UNDER FAIR LABOR STANDARDS ACT (FLSA)," and which creates "Work Week Group 2" directly under that heading. Likewise, the provision of the Manual bearing the subheading "Determination of Coverage Under FLSA" states that "[t]he provisions of Work Week Group 2 are made applicable to all classes which are determined by the Director of [CalHR] *to include positions subject to the FLSA*" (italics added), and the three definitions of overtime that apply to job classifications in Work Week Group 2 precisely track the FLSA.[17] We are therefore confident about the intent of CalHR to adopt FLSA

---

[17] The FLSA includes a general provision requiring overtime compensation for any work in excess of 40 hours in a workweek (29 U.S.C. § 207(a)(1)), and it includes a special provision, for law enforcement employees, requiring overtime compensation for work in excess of 171 hours in a 28-day period, and another special provision, for fire suppression employees, requiring overtime compensation for work in excess of 212 hours in a 28-day period. (29 U.S.C. § 207(k)(1)(B); 29 C.F.R. § 553.230 (2018).) CalHR's Pay Scale Manual defines overtime for Work Week Group 2 using the same three categories and the same hourly limits for each category.

overtime standards for job classifications falling within Work Week Group 2.

More to the point, the definition of compensable work time that appears in Section 10 of the Pay Scale Manual not only expressly references the FLSA, but it also tracks the language of the definition that applies under the FLSA. Specifically, the Pay Scale Manual states in relevant part: "For the purpose of identifying hours worked under the provisions of the FLSA, *only the time spent which is controlled or required by the State and pursued for the benefit of the State need be counted.*" (Italics added.) By way of comparison, the interpretive bulletin of the United States Department of Labor, defining compensable work time for purposes of the FLSA, states in relevant part: "[E]mployees subject to the act must be paid for all time . . . '*controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business.*' [Citation.]" (29 C.F.R. § 785.7 (2018), quoting *Tennessee Coal, supra,* 321 U.S. at p. 598, italics added.) Thus, contrary to the Court of Appeal's suggestion, the Pay Scale Manual clearly adopts the FLSA definition of compensable work time; it does not adopt Wage Order No. 4's definition.

It is true that the Pay Scale Manual's definition, like that of Wage Order No. 4, uses the word "control[]." It is also true that, in *Morillion*, we focused on the word "control" in the wage order's definition of compensable work time, making that word the basis of our decision. (See *Morillion, supra,* 22 Cal.4th at pp. 587–588 [holding that travel time is compensable under the wage orders because it was under the "control" of the employer].) But because the Pay Scale Manual's definition of compensable work time expressly refers to the FLSA, and because its language tracks that of the FLSA definition almost verbatim

(including the word " 'control[]' " that appears in that definition) (29 C.F.R. § 785.7 (2018), quoting *Tennessee Coal*, *supra*, 321 U.S. at p. 598), there is no possibility that the Pay Scale Manual intended to incorporate the wage order definition and not the FLSA definition.

Moreover, the Pay Scale Manual's definition of compensable work time includes, by implication, the limitation that the Portal-to-Portal Act placed on the FLSA. It is simply not credible that the Manual — which (1) uses the heading "WORK WEEK GROUPS ESTABLISHED UNDER FAIR LABOR STANDARDS ACT (FLSA)", (2) consistently and repeatedly incorporates FLSA standards in the provisions that fall under that heading, and (3) defines compensable work time using language drawn almost verbatim from the FLSA definition — was intended by CalHR to exclude an important aspect of the FLSA definition and that it did so without mentioning that fact expressly. If CalHR had wanted to exclude the Portal-to-Portal Act's limiting provisions from the Pay Scale Manual's FLSA-based definition of compensable work time, it certainly could have done so (see *Morillion*, *supra*, 22 Cal.4th at pp. 588–594; see also *In Re: Amazon.com, Inc., Fulfillment Center Fair Labor Standards Act (FLSA) and Wage and Hour Litigation* (6th Cir. 2018) 905 F.3d 387), but it would have needed to make that intention clear.

The Court of Appeal, however, strained the plain meaning of both the wage order and the Pay Scale Manual to hold that the latter incorporated the former's definition of compensable work time. The court did so because it correctly saw the need to harmonize the two administrative schemes to the extent possible. We conclude, however, that Wage Order No. 4 and the Pay Scale Manual cannot be harmonized and that the Pay Scale

Manual must be treated as a statutorily authorized exception to Wage Order No. 4.

As discussed, the IWC was given authority to adopt regulations governing wages, hours, and working conditions for "all employees" — private and public — in the state of California. (Lab. Code, § 1173; see *id.*, § 1182; *Martinez*, *supra*, 49 Cal.4th at pp. 52–57.) Pursuant to that authority, the IWC amended Wage Order No. 4 in 2001 to apply that order's minimum wage provision to the state government's rank-and-file employees, and in so doing, it also applied the wage order's broad definition of compensable work time to those employees. But at the time of that amendment (as now), Government Code section 19845, subdivision (a) already included an overlapping and much more specific authorization of administrative action. It provided: "Notwithstanding any other provision of this chapter, [CalHR] is authorized to provide for overtime payments as prescribed by the [FLSA] to state employees." Pursuant to the latter authority, CalHR had already, as of the time that the IWC amended Wage Order No. 4, included Work Week Group 2 in its Pay Scale Manual, and it had already provided that FLSA overtime standards — including the FLSA's narrow definition of compensable work time — applied to state employees in that work week group. Therefore, the IWC's action in 2001 must be viewed as being taken subject to CalHR's more specific authority, and the latter must prevail to the extent of a conflict. (See *State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 960 ["[T]he rule that specific provisions take precedence over more general ones trumps the rule that later-enacted statutes have precedence [over earlier ones]."]; *People v. Gilbert* (1969) 1 Cal.3d 475, 479 [" '[W]here the general statute standing alone would include the same matter as the special act,

and thus conflict with it, the special act will be considered as an exception to the general statute *whether it was passed before or after such general enactment.*' " (italics added)]; Code Civ. Proc., § 1859 ["[W]hen a general and particular provision are inconsistent, the latter is paramount to the former."].)[18]

In summary, the IWC was authorized to adopt general background rules governing employee wages and hours, but CalHR was the recipient of a more specific delegation, to establish salary ranges for state workers and to adopt, as appropriate, FLSA overtime standards for such workers. Regardless of which agency most recently exercised its delegated authority, to the extent CalHR's standards conflict with the more generally applicable wage order standards, they supersede them. It follows, therefore, that the Pay Scale Manual, including its narrow FLSA-based definition of compensable work time, governs the right of the unrepresented plaintiffs to compensation and that they are not entitled to

---

[18] Noting our conclusion that Wage Order No. 4 does not govern the unrepresented employees' claims, the concurring and dissenting opinion argues that we need not decide the relative degree of deference owed to Wage Order No. 4 and the Pay Scale Manual and that our discussion of that question (see *ante,* p. 40) is dictum regarding a matter that was not briefed by the parties. (Conc. & dis. opn. of Liu, J., *post,* pp. 10–11.) That argument misreads our opinion. Wage Order No. 4 and the Pay Scale Manual are in direct conflict, which forces us, in this case, to apply the rule that the specific prevails over the general. Moreover, the deference owed to IWC wage orders was a matter that the Court of Appeal noted and that plaintiffs relied on extensively in their briefs in this court.

minimum wage compensation based on Wage Order No. 4's broader definition of compensable work time.[19]

We conclude that the trial court was correct to reject the minimum wage claims of the unrepresented plaintiffs and that the Court of Appeal erred in reversing that portion of the trial court's judgment.

## B. The Breach of Contract Cause of Action

Plaintiffs argue on a breach of contract theory that they are entitled to overtime compensation for walk time that the state did not properly accredit to them as compensable work time. Plaintiffs rely on *White v. Davis* (2003) 30 Cal.4th 528 and *Madera Police Officers Assn. v. City of Madera* (1984) 36 Cal.3d 403. In *White* and *Madera,* we recognized an exception to the general principle that public employment is a creature of statute or ordinance, not contract. Specifically, we held that although

---

[19]    It is no answer to argue that Wage Order No. 4 governs the right of the unrepresented plaintiffs to receive the minimum wage, while the Pay Scale Manual governs their right to receive compensation at their regular rate of pay. (Cf. conc. & dis. opn. of Liu, J., *post*, pp. 8–10.)  That is so because the Pay Scale Manual occupies the field with respect to the compensation rates of state employees.  CalHR's regulations provide in relevant part:  "Unless otherwise indicated in the pay plan, the rates of pay set forth *represent the total compensation in every form* except for overtime compensation." (Cal. Code Regs, tit. 2, § 599.671, italics added.)  Here, the term "pay plan" refers, among other things, to the Pay Scale Manual. (See Cal. Code Regs, tit. 2, § 599.666.1.)  The concurring and dissenting opinion argues that the phrase "every form" in section 599.671 does not actually mean *every* form and that it does not cover work falling outside the pay plan's definition of hours worked. (See conc. & dis. opn. of Liu, J., *post*, p. 10.)  We see no reason to read this limitation into the broad phrase "every form."

the terms of public employment are legislatively determined, when a public agency employee has *completed* his or her work in accordance with those legislative terms, the employee's right to receive compensation for the completed work ripens into a contractual right that is protected by the contract clause of the state Constitution.  Thus, in *Madera*, the court said:  " '[T]o the extent services are rendered under statutes or ordinances then providing mandatory compensation for authorized overtime, the right to compensation *vests upon performance of the overtime work, ripens into a contractual obligation of the employer and cannot thereafter be destroyed or withdrawn* without impairing the employee's contractual right.' " (*Madera*, at p. 413, quoting *Longshore v. County of Ventura* (1979) 25 Cal.3d 14, 23, italics added.)  Likewise, in *White*, we said:  "[P]ast California cases clearly establish that although the conditions of public employment generally are established by statute rather than by the terms of an ordinary contract, *once a public employee has accepted employment and performed work for a public employer, the employee obtains certain rights arising from the legislative provisions that establish the terms of the employment relationship — rights that are protected by the contract clause of the state Constitution from elimination or repudiation by the state. . . .*  [A] number of cases have stated broadly that among the rights protected by the contract clause is 'the right to the payment of salary which has been earned.' " (*White*, at p. 566, quoting *Kern v. City of Long Beach* (1947) 29 Cal.2d 848, 853, italics added.)  We recently reaffirmed these conclusions in *Cal Fire Local 2881 v. California Public Employees' Retirement System* (2019) 6 Cal.5th 965.

These cases do not help plaintiffs except insofar as the legislatively created terms of their employment included walk

time that these employees actually worked and that the state failed to compensate. As to the represented plaintiffs, the Legislature approved the MOUs governing their employment, and it also approved the last, best, and final offer that applied during the 44-month impasse period in which no MOU was in place. We have already determined that in light of those legislative approvals, the represented plaintiffs' claims for additional compensation fail. Under *White* and *Madera*, plaintiffs' contractual rights are derivative of and limited by the legislatively created terms of their employment. Accordingly, we agree with the Court of Appeal that the trial court properly rejected the represented plaintiffs' claims for overtime compensation on a breach of contract theory.

As to the unrepresented plaintiffs, the Legislature delegated its power to set the terms of their employment to two administrative agencies, the IWC and CalHR, and we have already determined that CalHR's Pay Scale Manual, which adopts the FLSA definition of compensable work time, controls the unrepresented plaintiffs' right to compensation. To the extent the breach of contract claims of these plaintiffs are based on the failure to pay overtime for entry-exit walk time, such time is not compensable under the Pay Scale Manual's narrow definition of compensable work time, and therefore their claims lack merit. To the extent, however, that their claims are based on the failure to pay overtime for duty-integrated walk time, such time is compensable under the Pay Scale Manual's narrow definition of compensable work time. The unrepresented plaintiffs, having alleged that they performed such work and did not receive overtime compensation for it, *may* have a contractual interest in receiving that compensation. Whether they do

depends, of course, on whether they can prove their allegations in future phases of the trial.

Accordingly, we agree with the Court of Appeal that the trial court erred in rejecting the breach of contract claims of the unrepresented plaintiffs, although we do not agree with the Court of Appeal that the unrepresented plaintiffs can seek overtime compensation based on the broad definition of compensable work time that appears in Wage Order No. 4. Rather, they can only do so based on the FLSA's narrower definition of compensable work time, a definition that excludes entry-exit walk time.

## C. Labor Code sections 222 and 223 Cause of Action

We agree with the Court of Appeal that the trial court properly rejected the plaintiffs' claims for overtime compensation under Labor Code sections 222 and 223.

Labor Code section 222 states: "It shall be unlawful, in case of any wage agreement arrived at through collective bargaining, either wilfully or unlawfully or with intent to defraud an employee, a competitor, or any other person, to withhold from said employee any part of the wage agreed upon."

Labor Code section 223 states: "Where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract."

It is not at all clear that there is a private right of action for violation of Labor Code sections 222 and 223 (see Lab. Code, § 225.5 [specifying civil penalties that the Labor Commissioner may recover]), nor is it clear that these Labor Code provisions

apply against the state government (see *Campbell v. Regents of University of California* (2005) 35 Cal.4th 311, 330 [" 'Generally, . . . provisions of the Labor Code apply only to employees in the private sector unless they are specifically made applicable to public employees.' "]).  In any case, Labor Code section 222, by its terms, applies only when an employer withholds "the wage agreed upon" in "any wage agreement."  Thus, it does not apply to the unrepresented plaintiffs, whose employment was not governed by an agreement.  As to the represented plaintiffs, we have already concluded that they cannot show, as a factual matter, that duty-integrated walk time ever went uncompensated, and we have further concluded that the MOUs expressly precluded compensation for entry-exit walk time.  Accordingly, defendants did not withhold "the wage agreed upon" in a "wage agreement," and plaintiffs' Labor Code section 222 claims are without merit.

Plaintiffs' claims for overtime compensation under Labor Code section 223 fare no better.  Section 223 is concerned with "secret deductions or 'kick-backs' " that are not the subject matter of plaintiffs' allegations.  (*Kerr's Catering Service v. Department of Industrial Relations* (1962) 57 Cal.2d 319, 328.)  Plaintiffs allege, rather, that defendants applied too narrow a definition of compensable work time and, therefore, that plaintiffs were not paid overtime compensation for some of the work they performed.  We conclude that defendants did not apply the wrong definition of compensable work time, but even if they had done so, that error would not amount to "secretly pay[ing] a lower wage while purporting to pay the wage designated by statute" (Lab. Code, § 223), because there was nothing hidden or deceptive about defendants' payment practice.  (See *Prachasaisoradej v. Ralphs Grocery Co., Inc.*

(2007) 42 Cal.4th 217, 236.) Rather, defendants were forthright from the outset that they believed the narrow FLSA definition of compensable work time applied.

## III. CONCLUSION

We affirm the judgment of the Court of Appeal insofar as it rejected the claims of the represented plaintiffs.

We reverse the judgment of the Court of Appeal insofar as it allowed the unrepresented plaintiffs' minimum wage claims to proceed.

We affirm the judgment of the Court of Appeal insofar as it allowed the unrepresented plaintiffs' breach of contract claims to proceed, but we conclude that those claims should be limited to seeking unpaid overtime compensation based on the FLSA's definition of compensable work time, not based on the broader definition that appears in Wage Order No. 4.

We affirm the judgment of the Court of Appeal insofar as it rejected the unrepresented plaintiffs' claims under Labor Code sections 222 and 223.

We remand the case to the Court of Appeal with instructions to remand to the trial court for further proceedings consistent with this opinion. During such proceedings, defendants can raise any defenses that the trial court did not reach in its previous consideration of the case.

**CHIN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**

STOETZL v. DEPARTMENT OF HUMAN RESOURCES

S244751


Concurring and Dissenting Opinion by Justice Liu


I agree with today's opinion that the represented plaintiffs cannot pursue claims for duty-integrated walk time for the period when a memorandum of understanding (MOU) was in effect. The represented plaintiffs appear to have explicitly bargained for a specific amount of compensation for duty-integrated time, and they do not allege that the state failed to pay the agreed-upon amount. (Maj. opn., *ante*, at pp. 27–28.) With regard to the unrepresented employees, I agree that the Department of Human Resources (CalHR) Pay Scale Manual's definition of compensable work does not expressly include entry-exit walk time and that the state therefore has no obligation to pay regular or overtime compensation for that time. (*Id.* at pp. 10–12.) I also agree that plaintiffs' Labor Code section 222 and section 223 claims are without merit; the record contains no evidence that the state unlawfully withheld wages or paid the employees a lower rate in violation of an agreed-upon contract. (Maj. opn., *ante*, at pp. 48–49.)

I disagree, however, with the court's rejection of the represented plaintiffs' and unrepresented plaintiffs' minimum wage claims for entry-exit walk time. (Maj. opn., *ante*, at pp. 2–3, 26–45.) The 2001 revisions to the Industrial Welfare Commission's (IWC) wage order No. 4-2001 (Wage Order No. 4) extended minimum wage protections to rank-and-file employees of the state government. (Wage Order No. 4, § 1(B); see Cal. Code Regs., tit. 8, § 11040.) Because Wage Order No. 4 extended

the state's broad definition of compensable work to the represented employees, and because there is no clear indication that the represented employees agreed to forgo that right in the relevant MOUs, I would allow their minimum wage claims to proceed. In addition, because the CalHR Pay Scale Manual can be harmonized with the requirements of Wage Order No. 4, I see no obstacle to giving effect to both schemes in a manner that allows the unrepresented employees to pursue minimum wage compensation for entry-exit walk time under the wage order. Our longstanding rule that we interpret state wage and hour laws to "promote employee protection" (*Mendiola v. CPS Security Solutions, Inc.* (2015) 60 Cal.4th 833, 840) compels me to dissent from those portions of today's opinion.

## I.

Today's opinion concludes that the represented plaintiffs "agreed through the collective bargaining process to forgo compensation for entry-exit walk time." (Maj. opn., *ante*, at p. 30.) But nothing in the text of the MOUs or the record of the bargaining history indicates that the California Correctional Peace Officers Association (CCPOA) intended to forgo any entitlement that its members may have to minimum wage compensation for entry-exit walk time under Wage Order No. 4.

Through the MOUs, the represented plaintiffs "agreed to four hours' pay for 'pre and post work activities' in a recurring 28-day work period, and the record supports the trial court's finding that the phrase 'pre and post work activities' was used by the parties to refer to duty-integrated walk time." (Maj. opn., *ante*, at p. 27.) In concluding that the represented plaintiffs agreed to forgo compensation for entry-exit walk time, the court explains that each MOU "included a heading that read 'Entire

Agreement,' followed by a provision that stated: 'This [MOU] sets forth the full and entire understanding of the parties regarding the matters contained herein . . . .' . . . Because the MOUs 'set[] forth the full and entire understanding of the parties regarding the matters contained [t]herein,' and because compensation for pre- and postwork activities was one of the 'matters contained' in each of the MOUs, the MOUs precluded compensation for entry-exit walk time by not making any provision for it." (*Id.* at pp. 30–31.)

Although it may be plausible to adopt such a reading of the MOUs, it is equally plausible to understand "the matters contained herein" as referring only to matters addressed by the specific provisions of the MOUs — i.e., duty-integrated walk time, and not "compensation" generally or "pre- and postwork activities" generally. On this view, the parties reached an agreement on compensation for duty-integrated walk time and simply did not reach an agreement on entry-exit walk time.

But even if we assume the represented plaintiffs agreed to forgo compensation for entry-exit walk time in the 1998–1999 MOU, it is clear from the bargaining history that they did not agree to forgo any current or future protections to which they may be entitled under state wage and hour law. At no point during negotiations over the 1998–1999 MOU was there any indication that the contract provisions addressing "pre- and postwork activities" were meant to displace state wage and hour law. When questioned at trial, the state's chief negotiator, David Gilb, testified that there was no discussion about CCPOA waiving any of its members' state wage and hour law rights. According to Gilb, "The issue never came up in bargaining":

"Q: Do you recall there any being [*sic*] discussion whatsoever during the 1998 negotiations with respect to whether CCPOA was offering to or attempting on behalf of its members to waive any state wage and hour laws?

"A: They were not.

"Q: Do you recall any discussions during the 1998–1999 negotiations in which any representative of CCPOA made any concession or statement that you interpreted as a concession that state minimum wage law was either waived or otherwise agreed to not be utilized in determining the rights of CCPOA members?

"A: They made no statements. The issue never came up in bargaining.

"Q: So [*sic*] the extent that you do not recall any discussion of state wage and hour law, you would agree nobody at CCPOA made a statement or comment that was communicated to the State that you interpreted as an intent to waive any such wage and hour rights of the employees.

"A: It did not."

It is not surprising that the parties did not discuss any waiver by CCPOA of its members' right to minimum wage compensation at the time of the 1998–1999 MOU negotiation. In 1998, the IWC wage orders did not require state employers to provide minimum wage compensation. (Maj. opn., *ante*, at pp. 5–6.) In 2001, however, Wage Order No. 4 was amended to extend minimum wage compensation to state employees, and this guarantee, which has the same dignity and force as statutory law (*Brinker Restaurant Corp. v. Supreme Court* (2012) 53 Cal.4th 1004, 1027 (*Brinker*)), arguably extends to entry-exit walk time. (Maj. opn., *ante*, at pp. 6–7; see *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 587–588.) Nothing

in the bargaining history of the 1998–1999 or later MOUs suggests that the represented plaintiffs ever agreed to forgo the benefits of this change in the law. Even if the represented plaintiffs agreed to forgo minimum wage compensation for entry-exit walk time at a time when they had no right to such compensation under state law, that agreement cannot plausibly be understood to include agreement to forgo such compensation at a time when they *did* have a right to such compensation under state law. As the quotations from Gilb's testimony show, CCPOA never agreed to waive any of its members' rights to current or future wage and hour protections under state law.

The 2001 revision to Wage Order No. 4 changed the default law governing the relationship between state employers and their employees. From 2001 onward, the burden was on the *employer* to seek a concession from its employees that entry-exit walk time would *not* be compensable in future MOUs. Yet nothing in the bargaining history of the subsequent MOUs indicates that the parties revisited this issue or that CCPOA later agreed to waive any right its members may have to minimum wage compensation under the amended wage order in exchange for some other benefit. Thus, there is no basis in the text or bargaining history of any of the MOUs, either before or after 2001, for concluding that the represented plaintiffs agreed to forgo minimum wage compensation for entry-exit walk time under Wage Order No. 4 as revised in 2001.

Today's decision awards the employer an exemption from Wage Order No. 4's potential applicability to entry-exit walk time, even though the parties never negotiated over this issue after the IWC extended the wage order's minimum wage requirement to state employees in 2001. On its face, the court's opinion seems to suggest that any state employee union seeking

to preserve state law rights not addressed in an MOU's specific provisions must incorporate into the MOU an express reservation of all state law provisions conferring such rights, present or future. This is in substantial tension with extensive case law holding that waiver of statutory rights in collective bargaining occurs only when such waiver is "clear and unmistakable." (*Choate v. Celite Corp.* (2013) 215 Cal.App.4th 1460, 1465; see *Vasserman v. Henry Mayo Newhall Memorial Hospital* (2017) 8 Cal.App.5th 236, 245; *Mendez v. Mid-Wilshire Health Care Center* (2013) 220 Cal.App.4th 534, 543; *Vasquez v. Superior Court* (2000) 80 Cal.App.4th 430, 432; *14 Penn Plaza v. Pyett* (2009) 556 U.S. 247, 272 [same rule for federal statutory rights]; *Metropolitan Edison Co. v. NLRB* (1983) 460 U.S. 693, 708.) "[S]ilence in a bargaining agreement with respect to an issue previously in dispute does not meet the test of 'clear and unmistakable' language of relinquishment of that issue." (*Oakland Unified School Dist. v. Public Employment Relations Bd.* (1981) 120 Cal.App.3d 1007, 1011.)

The court's reliance on the Legislature's approval of the post-2001 MOUs is also unavailing. Although the Ralph C. Dills Act (the Dills Act) (Gov. Code, § 3512 et seq.), allows for an MOU to supersede other state law, such supersession requires legislative approval (Gov. Code, § 3517.5) if an MOU would amend any statutory provision not specifically designated in the Dills Act itself. The Dills Act enumerates the statutory provisions over which "the memorandum of understanding shall be controlling without further legislative action" when a provision is "in conflict with the provisions of a memorandum of understanding." (Gov. Code, §§ 3517.6, 3517.61.) Wage Order No. 4 is not one of the enumerated provisions; thus, in order to supersede it, an MOU must be presented to and approved by the

Legislature. Senate Bill No. 65, which authorized the 2001–2006 MOU at issue here, listed several statutory provisions that the MOU superseded, but it made no mention of Wage Order No. 4 or minimum wage compensation. (Sen. Bill No. 65 (2001–2002 Reg. Sess.) § 5.) And the parties have not pointed to anything in the bill's legislative history indicating that the MOU was intended to supersede the minimum wage provisions of Wage Order No. 4. Thus, the very legislation authorizing the 2001–2006 MOU confirms that the parties made no agreement displacing the represented plaintiffs' right to compensation for entry-exit walk time under Wage Order No. 4.

In sum, the 2001 revision to Wage Order No. 4 changed the baseline expectations with respect to minimum wage compensation for entry-exit walk time. Because there is no indication, much less a clear and unmistakable indication, that the represented plaintiffs agreed to waive any right they may have to such compensation in the post-2001 MOUs, I would allow their claim for such compensation to proceed.

## II.

As for the unrepresented plaintiffs, today's opinion concludes that Wage Order No. 4 and CalHR's Pay Scale Manual are in "direct conflict" (maj. opn., *ante*, at p. 39) and "cannot be harmonized" (*id*. at pp. 43–44) with respect to their definitions of compensable work time, and that the Pay Scale Manual's definition must prevail because of "CalHR's more specific authority" (*id*. at p. 44). But I see no direct conflict here. Nor do I think it necessary or wise to opine on whether the Pay Scale Manual is entitled to the same degree of judicial deference as IWC wage orders. As the court acknowledges, we must accord great deference to IWC wage orders, and we must "harmonize[]"

7

those orders with other statutory directives whenever possible. (*Id.* at p. 38.)  Such harmony is achievable here because the Pay Scale Manual can be readily construed in a manner that poses no obstacle to the unrepresented plaintiffs' minimum wage claim for entry-exit walk time under Wage Order No. 4.

In interpreting wage orders, we have long observed the "remedial nature" of the legislative enactments empowering the IWC to regulate "wages, hours and working conditions for the protection and benefit of employees."  (*Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 702; see *id.* at pp. 697–698 [IWC's authority also derives from article XIV, section 1 of the California Constitution].)  Wage orders are to be "liberally construed with an eye to promoting [employee] protection[s]" (*Industrial Welfare*, at p. 702), and "courts have shown the IWC's wage orders extraordinary deference, both in upholding their validity and in enforcing their specific terms" (*Martinez v. Combs* (2010) 49 Cal.4th 35, 61 (*Martinez*)).  Because wage orders have "the same dignity as statutes," they "must be given 'independent effect' separate and apart from any statutory enactments."  (*Brinker*, *supra*, 53 Cal.4th at p. 1027.)  Thus, insofar as we are able, we are required to give "independent effect" to Wage Order No. 4's minimum wage protections "separate and apart from" the Pay Scale Manual.  Even if the Pay Scale Manual is the product of "CalHR's more specific authority" (maj. opn., *ante*, at p. 44), we must still give effect to the terms of the IWC's wage order if possible.  Only in the case of a direct and irreconcilable conflict may we consider declining to give effect to the wage order.

The text of the Pay Scale Manual contains nothing that expressly excludes the unrepresented employees from the wage order's coverage.  Nor does it specifically address the availability

of minimum wage compensation for entry-exit activities. By contrast, the 2001 revision to Wage Order No. 4 expressly extended the "Definitions" and "Minimum Wage" sections to apply to state employees (Cal. Code Regs., tit. 8, § 11040, subd. 1(B)), even as the provisions addressing "Daily Overtime" and "Alternative Workweek Schedules" were *not* extended to apply to state employees (*id*., subds. (1)(B) & (3)). There is no conflict between the Pay Scale Manual and Wage Order No. 4: The Pay Scale Manual governs the regular and overtime pay of the unrepresented employees as members of "Work Week Group 2," and Wage Order No. 4 governs their entitlement to minimum wage compensation for other time worked.

Thus, Wage Order No. 4 and the Pay Scale Manual are overlapping administrative schemes that can both be enforced. Wage Order No. 4 defines compensable work time broadly, using a definition that arguably includes entry-exit walk time. But Wage Order No. 4 applies only in part to state employees. Specifically, its minimum wage provision applies, but not its overtime provision (Wage Order No. 4, § 1(B)), and its minimum wage provision does not apply to administrative, executive, or professional employees (*id.*, § 1(A)). Meanwhile, the Pay Scale Manual defines compensable work time narrowly, incorporating the definition established by the federal Fair Labor Standards Act of 1938 (FLSA) (29 U.S.C. § 201 et seq.). But the Pay Scale Manual governs only the regular and overtime compensation of employees falling within Work Week Group 2; it says nothing about the minimum wage compensation of such employees for hours worked outside of its definition of compensable work time. In short, Wage Order No. 4 and the Pay Scale Manual govern distinct forms of compensation, and there is no obstacle to

enforcing both schemes simultaneously, each within its own sphere of application.

The court concludes that "the Pay Scale Manual occupies the field with respect to the compensation rates of state employees" (maj. opn., *ante*, at p. 45, fn. 18) because CalHR's regulations say: "Unless otherwise indicated in the pay plan, the rates of pay set forth represent the total compensation in every form except for overtime compensation." (Cal. Code Regs., tit. 2, § 599.671.) Although the court's reading of this regulatory language is reasonable, I do not think it is the only reasonable reading. The language also may be construed to mean that "the rates of pay set forth represent the total compensation in every form" *for all hours worked that qualify as compensable work time under the pay plan.* In other words, within the sphere of application of the pay plan (here, the Pay Scale Manual), the pay plan exclusively sets forth "the rates of pay" comprising "total compensation in every form except for overtime compensation." Notably, the regulation does not use a "comprehensive" phrase such as " 'notwithstanding any other provision of law,' " which "signals a broad application overriding all other code sections unless it is specifically modified by use of a term applying it only to a particular code section or phrase." (*In re Marriage of Cutler* (2000) 79 Cal.App.4th 460, 475; see *Arias v. Superior Court* (2009) 46 Cal.4th 969, 983.) Because the regulation can be reasonably construed in a manner that does not displace the minimum wage requirement of Wage Order No. 4, that is the construction we must adopt in light of our obligation to give " 'independent effect' " to the wage order if reasonably possible. (*Brinker, supra,* 53 Cal.4th at p. 1027.)

Today's opinion takes insufficient account of our long history of deference to IWC wage orders and unnecessarily

suggests that the Legislature's delegation of authority to CalHR is enough to afford its manual the same dignity as IWC wage orders. (Maj. opn., *ante*, at pp. 40–41.) There is no reason here to address whether an ordinary statutory delegation of authority is equivalent to a constitutionally authorized delegation of legislative, judicial, and executive authority, let alone a delegation of authority that has been affirmed repeatedly, over nearly a century, by "formal expressions of legislative and voter intent" construed to insulate the IWC's work from judicial interference. (See *Martinez, supra,* 49 Cal.4th at p. 61; see Cal. Const., art. XIV, § 1.) The issue has not been briefed by the parties, and the court's discussion of this point is dictum in light of its conclusion that the wage order does not govern the unrepresented plaintiffs' claims.

In sum, I agree with the trial court that CalHR intended the FLSA standard to define compensable work time for purposes of calculating the unrepresented plaintiffs' regular and overtime compensation. But this conclusion does not foreclose those plaintiffs' minimum wage claims. Although compensable work time *for the purpose of calculating regular and overtime compensation* is governed by the narrow FLSA definition, compensable work time *for the purpose of paying the minimum wage* is governed by the broader Wage Order No. 4 definition.

I respectfully dissent from the court's rejection of the represented plaintiffs' and the unrepresented plaintiffs' minimum wage claims.

**LIU, J.**

**I Concur:**

**CUÉLLAR, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Stoetzl v. State of California

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 14 Cal.App.5th 1256
**Rehearing Granted**

_____

**Opinion No.** S244751
**Date Filed:** July 1, 2019

_____

**Court:** Superior
**County:** San Francisco
**Judge:** John E. Munter

_____

**Counsel:**

Carroll, Burdick & McDonough, Laurie J. Helper; Squire Patton Boggs (US), David M. Rice; Messing Adam & Jasmine, Jack T. Friedman, Gary M. Messing, Gregg McLean Adam, Yonatan L. Moskowitz, Monique Alonso; Goyette and Associates, Inc., and Gary G. Goyette for Plaintiffs and Appellants.

Kronick, Moskovitz, Tiedemann & Girard, David W. Tyra, Kristianne T. Seargeant; Joan A. Markoff, Frolan R. Aguiling, Christopher E. Thomas and David D. King for Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gregg McLean Adam
Messing Adam & Jasmine
235 Montgomery Street, Suite 828
San Francisco, CA  94104
(415) 266-1800

David W. Tyra
Kronick, Moskovitz, Tiedemann & Girard
400 Capitol Mall, 27th Floor
Sacramento, CA  95814
(916) 321-4500